**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PATRIOT MANUFACTURING, INC.,** | ) | |
| | ) | <u>**PUBLISH**</u> |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 05-0321-WS-M** |
| | ) | |
| **MICHAEL and KALIE DIXON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the Petition to Compel Arbitration (doc. 2) filed by plaintiff Patriot Manufacturing, Inc. ("Patriot"). The parties having fully availed themselves of the opportunity to present argument and authority in support of their respective positions, and no party having identified disputes of material fact that might require an evidentiary hearing or other factfinding event, the Court finds that the Petition is ripe for disposition at this time.[1]

**I.      Background.**

On or about April 26, 2005, defendants Michael and Kalie Dixon (the "Dixons") filed a lawsuit in the Circuit Court of Clarke County, Alabama, styled *Michael and Kalie Dixon v. Patriot Homes of Alabama, Inc., et al.*, Case No. CV-05-074-B (the "State Court Action"). The Dixons alleged that they had purchased a Patriot-manufactured mobile home from a dealer named Cedar Ridge Homes, Inc. ("Cedar Ridge") in January 2004, but that the home suffered from a litany of defects, including structural and plumbing problems, cracked and warped walls, flooring and electrical deficiencies, and ill-fitting doors and windows. Based on these allegations, the Dixons brought claims

---

[1]      A Petition to Compel Arbitration is an initial pleading, and is typically accompanied by a separate motion to compel arbitration. Patriot has not filed such a motion here; however, the Federal Arbitration Act provides that applications to compel arbitration "shall be made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6. In accordance with those principles, Patriot's Petition may be resolved via ordinary motion practices, notwithstanding the absence of a distinct motion designated as such.

against Patriot and Cedar Ridge for, *inter alia*, breach of warranty, negligence, fraud, and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* The State Court Action remains pending at this time.

On June 2, 2005, Patriot initiated this action against the Dixons by filing a Petition to Compel Arbitration (doc. 1) pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"). Cedar Ridge is not a party to this case. Patriot maintains that the Dixons' claims against it in the State Court Action all lie within the scope of an enforceable arbitration agreement (the "Arbitration Agreement") executed by the Dixons, Patriot and Cedar Ridge as part of the mobile home sales transaction. The Arbitration Agreement states as follows:

> "All disputes, claims or controversies of every kind or nature that may arise between or among the Owner, Retailer, [or] Patriot ... shall be settled by binding arbitration conducted pursuant to the provisions of 9 U.S.C. Section 1, *et seq.*, and administered by the American Arbitration Association ("AAA") under its commercial Arbitration Rules .... Without limiting the generality of the foregoing, it is the intention of the Owner, the Retailer, and Patriot to resolve by binding arbitration all disputes, whether arising out of tort, contract, or otherwise, arising from, concerning or related to the Home, its design, sale, delivery, warranties, setup, repair, installation, manufacture, performance, condition, or financing or any insurance obtained in connection with the Home, including any dispute, controversy, claim or question of any nature whatsoever related to the enforceability, validity, scope or interpretation of this Arbitration Agreement."

(Petition, Exh. A, ¶ 2.) The Arbitration Agreement is a one-page, standalone document, and does not appear to have been referenced in other transactional documents completed by the Dixons, Cedar Ridge and Patriot at the time of the sale.

In connection with its Petition, Patriot filed a Motion for Preliminary Injunction (doc. 9) seeking a stay of the State Court Action pending resolution of its Petition in federal court. A flurry of briefing ensued, with the Dixons contesting subject matter jurisdiction in the absence of Cedar Ridge (a non-diverse entity) and alternatively arguing that the Court should apply *Colorado River* abstention. On September 1, 2005, the Court entered an Order (doc. 16) rejecting the Dixons' jurisdictional and abstention attacks, but denying Patriot's Motion for Preliminary Injunction pursuant to the Anti-Injunction Act, 28 U.S.C. § 2283. Perceiving no reason to delay resolution of the merits of the Petition, the Court ordered supplemental briefing on the enforceability of the Arbitration Agreement.

## II.     Legal Standard.

The strong federal preference for arbitration of disputes expressed by Congress in the FAA must be enforced wherever possible.  *See Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1258 (11th Cir. 2003).  However, notwithstanding this federal policy favoring arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted).  A district court must undertake a two-step inquiry when considering a motion to compel arbitration.  Its first task "is to determine whether the parties agreed to arbitrate that dispute," a determination made by reference to the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (citations omitted).  Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Id.*  If the court determines that the parties did agree to arbitrate the dispute in question, then the second step is to consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id.* at 628.

In determining whether the parties agreed to arbitrate a particular dispute, courts consider: (1) whether there is a valid agreement to arbitrate; and (2) whether the dispute in question falls within the scope of that agreement. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996); *Hudson v. Outlet Rental Car Sales, Inc.*, 876 So.2d 455, 457 (Ala. 2003).  To resolve these questions, courts apply state law principles relating to ordinary contract formation and interpretation, construed through the lens of the federal policy favoring arbitration. *See Young v. Jim Walter Homes, Inc.*, 110 F. Supp.2d 1344, 1346 (M.D. Ala. 2000); *Oakwood Mobile Homes, Inc. v. Barger*, 773 So.2d 454, 459 (Ala. 2000) ("[w]hen deciding whether the parties agree to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts") (citations omitted).  Under Alabama law, a valid agreement to arbitrate is created when the agreement is voluntarily entered into and is contained in a contract involving interstate commerce. *See Old Republic Ins. Co. v. Lanier*, 644 So.2d 1258, 1260 (Ala. 1994).

-3-

## III.    Analysis.

In this case, there is no dispute that the parties agreed to arbitrate all disputes encompassed by the State Court Action.  Thus, the only question before the Court is whether external legal constraints preclude arbitration.  The Dixons purport to identify three such constraints.  First, they maintain that the agreement is unenforceable as a matter of law because it fails to comport with the "single document rule" under the Magnuson Moss Warranty Act ("MMWA").  Second, they urge the Court to find that binding arbitration agreements are always unenforceable under the MMWA.  Third, the Dixons contend that the Arbitration Agreement is unconscionable and that it therefore cannot be enforced against them.

### A.    Whether the Arbitration Agreement Violates the "Single Document Rule."

The Dixons' first salvo is that the Arbitration Agreement violates the disclosure requirements of the MMWA.

#### 1.    Statutory/Regulatory Treatment of Arbitration Agreements.

Under the MMWA, "any warrantor warranting a consumer product to a consumer by means of a written warranty, shall to the extent required by rules of the [Federal Trade] Commission, fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty."  15 U.S.C. § 2302(a).  The statute specifies that such rules <u>may</u> require inclusion in the written warranty of information concerning any "informal dispute settlement procedure" offered or required by the warrantor.  *Id.* § 2302(a)(8).  The MMWA also directs the Federal Trade Commission ("FTC") to design rules containing "minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty."  *Id.* § 2310(a)(2).[2]

In satisfaction of its statutory mandate, the FTC promulgated a rule providing that "[a]ny warrantor warranting to a consumer by means of a written warranty a consumer product actually

---

[2]        Regrettably, the statute does not define the term "informal dispute settlement procedure."  If Helen of Troy had the face that launched 1,000 ships, then surely this statutory and regulatory ambiguity has the potential to launch 1,000 lawsuits, given the prevalence of arbitration agreements in modern retail consumer transactions and the statutory uncertainty as to whether such agreements lie within the MMWA's purview.

costing the consumer more than $15.00 shall clearly and conspicuously disclose in a single document in simple and readily understood language," nine specific items of information.  16 C.F.R. § 701.3(a).  This requirement is known as the "single document rule."[3]  The nine items that must be disclosed in a written warranty are as follows: (i) the identities of parties to whom the warranty is extended; (ii) a clear description and identification of any parts of the product excluded from the warranty; (iii) a statement of what the warrantor will and will not do in case of defect, malfunction or other nonconformity of the product to the warranty; (iv) the temporal boundaries of the warranty; (v) a step-by-step description of the procedure for consumers to obtain performance under the warranty; (vi) "[i]nformation respecting the availability of *any informal dispute settlement mechanism* elected by the warrantor;" (vii) a statement identifying any limitations on the duration of implied warranties; (viii) a statement of exclusions or limitations on relief (such as incidental or consequential damages); and (ix) a statement advising the buyer that the warranty confers specific legal rights, and that other rights may be conferred pursuant to state law.  *Id.* (emphasis added); *see also Bailey v. Monaco Coach Corp.*, 350 F. Supp.2d 1036, 1040 (N.D. Ga. 2004) ("In order to prevent consumer misunderstanding, the single document rule codified by the [FTC] specifies nine mandatory disclosures.").[4]

---

[3]      A warrantor's failure to comply with the single document rule precludes him from compelling arbitration of express warranty or MMWA claims, but does not impair arbitrability of other causes of action.  *See Stevens v. Phillips*, 852 So.2d 123, 133 (Ala. 2002) (notwithstanding violation of MMWA disclosure rules, buyer can be compelled to arbitrate non-warranty "other claims" against warrantor); *Ex parte Thicklin*, 824 So.2d 723, 730 & n.2 (Ala. 2002) (trial court erred in compelling arbitration of express warranty and MMWA claims where warrantor failed to disclose arbitration requirement in written warranty, but implied warranty claims remain subject to arbitration); *Cunningham v. Fleetwood Homes of Georgia, Inc.*, 253 F.3d 611, 613, 624 (11th Cir. 2001) (leaving undisturbed trial court's decision to compel arbitration of all claims except for MMWA and express warranty claims, where warranty was violative of single document rule).  Thus, the Dixons' reliance on the "single document rule" implicates only the arbitrability of their express warranty and MMWA causes of action, and in no way affects or relates to the arbitrability of the claims for negligence, fraud, misrepresentation, breach of implied warranties and the like.

[4]      The "informal dispute settlement mechanism" language is replicated in § 703.2, which provides in part that "[t]he warrantor shall disclose clearly and conspicuously at least the following information on the face of the written warranty: ... A statement of the availability of the informal dispute settlement mechanism."  16 C.F.R. § 703.2(b)(1).  There appears to be no meaningful distinction

2.      The Cunningham / Davis Interplay.

The Dixons maintain that Patriot furnished them with a written warranty that "fails to reference this [arbitration] requirement in any manner." (Defendants' Memorandum (doc. 8), at 21.)[5]  Because the warranty does not mention the Arbitration Agreement, the Dixons claim, it runs afoul of the single document rule and therefore cannot be enforced.  This position is not without superficial appeal.  After all, in *Cunningham v. Fleetwood Homes of Georgia, Inc.*, 253 F.3d 611 (11th Cir. 2001), the Eleventh Circuit implicitly concluded (with no explanation or analysis) that an arbitration agreement was an "informal dispute settlement mechanism" within the meaning of the FTC's disclosure rules, such that it would have to be referenced in the warranty.  *Id.* at 622.[6]  *Cunningham* affirmed the district court's decision not to compel arbitration where the warrantor did not disclose the arbitration agreement in the warranty,.  *Id.* ("Compelling arbitration on the basis of an arbitration agreement that is not referenced in the warranty presents an inherent conflict with the Act's purpose of providing clear and concise warranties to consumers."); *see also Ex parte Thicklin*, 824 So.2d 723, 730 (Ala. 2002) (following

---

between the use of the term "informal dispute settlement procedure" in the statute and "informal dispute settlement mechanism" in the regulations; therefore, for purposes of this Order, both terms will be utilized interchangeably.

[5]      Despite their vigorous debate over the status of Patriot's written warranty vis a vis the MMWA, neither side has included a copy of said warranty in its filings.  Thus, the record is silent as to the actual form and contents of Patriot's written warranty, and the Dixons have failed to show that the warranty document omits reference to the Arbitration Agreement.  Notwithstanding this omission, Patriot does not contest the Dixons' representation that the challenged warranty makes no mention of the Arbitration Agreement.  On that basis, the Court will assume for purposes of this Order that Patriot's warranty contained no reference to the Arbitration Agreement.

[6]      *Cunningham* nowhere explicitly states that an arbitration agreement constitutes an informal dispute settlement mechanism under the MMWA.  Nonetheless, a plain reading of that decision shows that the panel's rationale equated arbitration agreements with informal dispute settlement mechanisms.  In summarizing its holding, the *Cunningham* court explained that the only issue before it was whether a third-party beneficiary could compel binding arbitration of warranty claims "when there is no reference to binding arbitration in the warranty."  *Id.* at 624.  In the very next sentence, *Cunningham* explains that this third-party beneficiary's "failure to disclose in the warranty a term or clause requiring the Cunninghams to utilize an informal dispute resolution mechanism runs afoul of the disclosure requirements of the" MMWA.  *Id.*

-6-

*Cunningham* and deeming failure to disclose arbitration requirement in warranty to be violation of MMWA).

But *Cunningham*'s assumption that an arbitration agreement is an "informal dispute settlement mechanism" for purposes of the MMWA's single document rule is no longer valid in this Circuit.  One year after *Cunningham* was decided, the Eleventh Circuit found "no evidence that Congress intended binding arbitration to be considered an informal dispute settlement procedure" under the MMWA. *Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268, 1276 (11th Cir. 2002) (citation omitted). The *Davis* opinion echoed a Fifth Circuit ruling that "binding arbitration is not normally considered to be an 'informal dispute settlement procedure,' and it therefore seems to fall outside the bounds of the MMWA and of the FTC's power to prescribe regulations." *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 476 (5th Cir. 2002).  The *Walton* court closely scrutinized the MMWA's legislative history, after which it concluded that "the reference to 'informal dispute settlement procedure' seemingly precludes binding arbitration from its scope, as binding arbitration is not normally considered an informal procedure." *Id.* at 476-77.

In the wake of *Cunningham* and *Davis*, then, what is the present status of the MMWA's disclosure requirements?  Clearly, the single document rule remains alive and well.  But the statutory and regulatory scheme does not require that <u>all</u> information having any bearing on the warranty must be disclosed within the warranty.   To the contrary, the MMWA – and more precisely § 2302(a) – plainly provides that a warrantor's required disclosures under the single document rule are limited to those specifically enumerated in the FTC regulations.  Those regulations do not identify arbitration agreements as items that must be disclosed, but they do mandate disclosure of "informal dispute settlement mechanisms."  The *Davis* case, which is binding precedent to this Court, decided that arbitration agreements are not "informal dispute settlement mechanisms" in the context of the MMWA.

Under this synopsis of the law, then, it is plain that, while the single document rule enjoys continued vitality, arbitration agreements lie beyond the scope of the disclosures required pursuant to that rule.  That being the case, the Arbitration Agreement executed by Patriot and the Dixons does not fail for want of compliance with the single document rule even though the parties apparently agree that

Patriot's warranty did not mention arbitration.  Simply put, the single document rule (as set forth in §

2302(a) and FTC regulations) does not require disclosure of the Arbitration Agreement within the

warranty.[7]  Therefore, Patriot's failure to make such a disclosure in no way forecloses enforcement of

the Arbitration Agreement.

### 3.  Defendants' Objections.

In the face of this interpretation of the single document rule, the Dixons counter with three

arguments.  First, they assert that *Cunningham* enlarges the rule to require a warrantor to disclose "all

relevant terms of the warranty," whether or not those terms were listed in the statute or FTC

regulations.  Because an arbitration agreement is plainly a "relevant term," the Dixons maintain, the

single document rule obliges Patriot to disclose it in the warranty.  (Defendants' Supplemental Brief, at

4.)  Second, the Dixons maintain that the correct construction of the MMWA and its accompanying

regulations is that arbitration agreements are "informal dispute settlement mechanisms," disclosure of

which is mandated by the regulations.  (*Id.* at 13-15.)  Third, the Dixons insist that excluding arbitration

agreements from the ambit of the single document rule would yield nonsensical and unfair results.

### a.  The "All Relevant Terms" Objection.

The Dixons object that limiting the single document rule to the FTC regulations is too narrow.

Instead, they claim, the rule was properly formulated by the Eleventh Circuit in *Cunningham* as

requiring a warrantor to "disclose in a single document all relevant terms of the warranty."  253 F.3d at

---

[7]     The Dixons protest that Patriot's position requires a finding that "the single document rule is no longer valid," and decry the threatened "elimination of the single document rule." (Defendants' Supplemental Brief (doc. 19), at 2, 4.)  Patriot's argument does nothing of the sort.  At issue here is not whether the single document rule exists (it unquestionably does), but rather its breadth and what must be disclosed thereunder.  A straightforward interpretation of the foregoing authorities is that the single document rule, as formulated by FTC regulations, includes an exhaustive list of the information that must be disclosed.  The rule omits reference to arbitration agreements.  This omission implies that such information is beyond the scope of the single document rule; therefore, a warrantor's failure to recite an arbitration agreement in the warranty violates neither the single document rule nor the MMWA.

622.[8]  The problem with Dixons' seizing on this bit of dicta is that the *Cunningham* panel did not purport to announce a new construction of the single document rule.[9]  It did not parse the statute or the regulations to buttress the proposition that the single document rule requires disclosure of "all relevant terms," nor did it identify any inadequacies or deficiencies in the list of terms enumerated in the FTC regulations.  Surely, the *Cunningham* court would have engaged in such a searching analysis if it had intended to rewrite the statutory rule in that manner.[10]  Taken in context, *Cunningham*'s references to disclosure of "all relevant terms" were not a proclamation about the reach and scope of the single document rule, but were merely shorthand statements designed to circumvent the unwieldiness of writing "disclosure in a single document of those specific terms of a warranty enumerated by the

---

[8]     Elsewhere, the *Cunningham* court framed the rule as "requiring warrantors to present all information relevant to the warranty in one place, where it might be easily located and assimilated by the consumer."  *Id.* at 621.

[9]     The *Cunningham* ruling in no way turned on an "all relevant terms" formulation of the single document rule.  To the contrary, the *Cunningham* court's finding was that an arbitration agreement not mentioned in a written warranty was unenforceable because FTC regulations shaping the single document rule require disclosure of "informal dispute settlement mechanisms."  253 F.3d at 624.  Given its implicit, unstated determination that an arbitration agreement is an "informal dispute settlement mechanism" under the MMWA, *Cunningham* did not have to read the ambit of the single document rule any more broadly than the nine enumerated categories in the regulations, and certainly did not need to devise a new, expanded iteration of the rule in order to reach its outcome.

[10]     The logistical and practical difficulties inherent in a sweeping "all relevant terms" construction of the single document rule are immense.  What terms are "relevant," if the rule is not confined to those terms specifically enumerated by the FTC?  Who decides what a "relevant" term is, if not the FTC?  How is a warrantor to know, *a priori*, whether a given term is or is not "relevant"?  Absent such knowledge, how is a warrantor to comply with the single document rule?  It is easy to envision warrantors adopting a "kitchen-sink" approach in the face of such uncertainty, which would yield counterproductive warranty documents that envelop and overwhelm consumers in a miasma of relatively insignificant details, all at cross purposes to the MMWA's statutory objectives of clarity and simplification.  The Court has every confidence that the Eleventh Circuit would have ventured into this dense, thorny thicket only with the utmost circumspection.  To accept the Dixons' reading of *Cunningham* would be to find that the panel rushed headlong into an interpretational quagmire without a second thought in framing the asymptote of the rule.  The Court finds it exceedingly unlikely that the *Cunningham* court would have done so.

Federal Trade Commission in 16 C.F.R. § 701.3, pursuant to the authority delegated by 15 U.S.C. § 2302(a)." In short, the Dixons interpret *Cunningham* as doing something it manifestly did not.[11]

The Dixons repeatedly insinuate that the single document rule had its genesis in *Cunningham*. (Defendants' Supplemental Brief, at 2, 3, 4.) It did not. The rule is a creature of statute and regulation, not of judge-made law. It was forged on the anvil of § 2302(a) and shaped by the hammer of § 701.3. Thus, the MMWA and its regulations trace the scope of the single document rule, and it is not the courts' place to substitute their judgment for Congress and the FTC as to how far that rule should reach. For all of these reasons, the Court declines to construe *Cunningham* as superimposing a new, expanded single document rule over that promulgated by Congress in § 2302(a), and implemented by the FTC via § 701.3.[12]

> b.   *The Statutory Interpretation Objection.*

The Dixons' next objection is that arbitration agreements actually are "informal dispute settlement mechanisms" as that term is used in the MMWA and the FTC regulations.[13] In support of

_____

[11]   The Dixons rely heavily on a Delaware state court opinion interpreting *Cunningham* as expanding the single document rule beyond the regulatory text and recognizing a "broader principle that a warrantor is required to disclose in a single document all relevant terms of the warranty." *DaimlerChrysler Corp. v. Matthews*, 848 A.2d 577, 577-78 (Del.Ch. 2004). For the reasons set forth *supra*, the Court cannot agree with *DaimlerChrysler* that *Cunningham* intended to fashion a new, expanded version of the single document rule that transcends the boundaries of the MMWA and the FTC's implementing regulations.

[12]   This conclusion is reinforced by the strong federal policy favoring arbitration and the deference that courts must pay to congressional intent before excluding arbitration of statutory claims. *See Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309 (11th Cir. 2002) ("the Supreme Court has commanded that questions of arbitrability mst be addressed with a healthy regard for the federal policy favoring arbitration"); *Davis*, 305 F.3d at 1273 ("unless Congress has clearly expressed an intention to preclude arbitration of the statutory claim, a party is bound by its agreement to arbitrate"). In light of this policy, the Court will not embrace the strained reading of *Cunningham* that would be required to defeat arbitrability here.

[13]   This argument, if accepted, would validate the Dixons' position that written warranties must include references to arbitration agreements. After all, the single document rule provides that warranties must disclose "[i]nformation respecting the availability of any informal dispute settlement procedure offered by the warrantor and a recital, where the warranty so provides, that the purchaser

this position, the Dixons cite a law review article and a dissenting opinion in an Illinois state case for the proposition that when the MMWA was enacted in 1975, the phrase "informal dispute settlement mechanisms" had a different meaning than it does today.  *See* Andrew Lamis, *The New Age of Artificial Legal Reasoning as Reflected in the Judicial Treatment of the Magnuson-Moss Act and the Federal Arbitration Act*, 15 Loy. Consumer L. Rev. 173, 179 (2003); *Borowiec v. Gateway 2000, Inc.*, 808 N.E.2d 957, 975 (Ill. 2004) (Kilbride, J., dissenting).

Any debate on this point is foreclosed by the Eleventh Circuit's opinion in *Davis*, wherein the court concluded that binding arbitration "is of a different nature" than informal dispute settlement procedures.  305 F.3d at 1276.  *Davis* pointedly noted the paucity of evidence in the statutory language or legislative history "that Congress intended binding arbitration to be considered an informal dispute settlement procedure." *Id.*  This distinction between binding arbitration and informal dispute settlement mechanisms prompted *Davis*'s determination that FTC regulations defining arbitration as a type of informal dispute settlement mechanism (as to which the FTC was empowered to issue regulations) were unreasonable.  It was also a key analytical underpinning of *Davis*'s ultimate holding that "written warranty claims arising under the [MMWA] may be subject to valid binding arbitration agreements." *Id.* at 1280.[14]  The Fifth Circuit has reached a similar conclusion.  *See Walton*, 298 F.3d

---

may be required to resort to such procedure before pursuing any legal remedies in the courts."  15 U.S.C. § 2302(a)(8); *see also* 16 C.F.R. § 701.3(a) (requiring warranty to disclose "[i]nformation respecting the availability of any informal dispute settlement mechanism elected by the warrantor").  If arbitration were an informal dispute settlement procedure/mechanism, then the rule would unquestionably encompass arbitration agreements, and Patriot's failure to disclose the Arbitration Agreement in the written warranty would render the arbitration provision unenforceable as to express warranty and MMWA claims.

[14]      Had *Davis* not rejected the FTC's position that arbitration agreements were informal dispute settlement mechanisms, the reasoning undergirding its holding would have collapsed.  The *Davis* court was examining whether Congress had expressed a clear intention to preclude binding arbitration of statutory claims, such a clear expression being required to cut off arbitration rights under the FAA.  *See Mitsubishi Motors*, 473 U.S. at 628 (explaining that parties who validly agree to arbitrate should be held to their agreement unless Congress evinces an intention to preclude mandatory arbitration of specific statutory claims).  Although the language of the MMWA makes no mention of binding arbitration, the *Davis* appellees maintained that references to "informal dispute settlement

at 477 (opining that MMWA's reference to "informal dispute settlement procedures" appears to preclude binding arbitration, inasmuch as arbitration is not an informal procedure and nothing suggests that Congress intended binding arbitration to be within scope of MMWA's informal dispute settlement procedures).[15]

In arguing that arbitration is an informal dispute settlement procedure within the meaning of the MMWA, the Dixons ask this Court to credit law review articles and dissenting state court opinions from other jurisdictions over Eleventh and Fifth Circuit authority. This the Court cannot do. Pursuant to *Davis* and *Walton*, then, the Court finds that the MMWA's requirement that written warranties disclose informal dispute settlement procedures does not encompass an obligation to disclose arbitration agreements because arbitration is not an informal dispute settlement procedure within the meaning of the statute.[16] Thus, neither the MMWA nor the FTC regulations sweep arbitration

---

procedures" in the legislative history showed that Congress had considered all methods of dispute resolution, including arbitration. Yet 15 U.S.C. § 2310(a) is drafted in terms recognizing only nonbinding informal dispute settlement procedures. Because Congress considered all kinds of dispute resolution procedures, the *Davis* appellees argued, its decision to allow only nonbinding informal dispute settlement procedures in the MMWA evinced an intent to forbid binding arbitration. If the Eleventh Circuit had agreed with the *Davis* appellees that arbitration was included under the umbrella of "informal dispute settlement procedures," then its finding that Congress did not express a clear intent to bar binding arbitration of MMWA claims would have been imperilled and probably invalidated.

[15]     In its supplemental brief (doc. 20), plaintiff cites *Harrison v. Nissan Motor Corp. in U.S.A.*, 111 F.3d 343 (3rd Cir. 1997) for its purported "holding" that "binding arbitration is not an informal dispute settlement procedure[] subject to FTC regulation." (Plaintiff's Supplemental Brief, at 15.) A careful reading of *Harrison* shows that plaintiff has overstated that case. *Harrison* involved a non-binding arbitral procedure through which a consumer could file suit under Pennsylvania's Lemon Law if she did not receive the arbitrator's decision within 40 days. The Third Circuit found that this procedure "does not constitute arbitration within the meaning of the FAA." 111 F.3d at 351. Although not central to its decision, the *Harrison* court opined in passing that if the drafters of the MMWA and the FTC regulations had wanted "informal dispute resolution procedures" to be subsumed under the FAA, they likely would have used the term "arbitration." *Id. Harrison* is thus no more than tangentially relevant to the issues presented here.

[16]     *Davis*'s finding is reinforced by an exercise in statutory construction. In obliging a warrantor to disclose "informal dispute settlement procedures," Congress stated that the warrantor should also recite "that the purchaser may be required to resort to such procedure before pursuing any

agreements within the ambit of disclosures that must be made in a written warranty pursuant to the single document rule.

c.    *The Fairness Objection.*

Next, the Dixons argue that any interpretation of the single document rule that excludes arbitration agreements would be unjust and unfair. According to the Dixons, omission of arbitration agreements from the list of mandatory disclosures in § 701.3 should not be viewed as an indication that the FTC wished to exempt such agreements from the rule. Instead, the Dixons insist that if § 701.3 is construed in the context of the FTC's long-held belief that binding arbitration is prohibited under the MMWA, it becomes clear that excising arbitration agreements from the scope of the single document rule would contravene the FTC's intent.

The Dixons are correct that the FTC's position has long been that informal dispute settlement procedures cannot be binding under the MMWA. *See* 16 C.F.R. § 700.8 ("A warrantor shall not indicate in any written warranty ... either directly or indirectly that the decision of the warrantor ... or any designated third party is final or binding in any dispute concerning the warranty"); 16 C.F.R. § 703.5(j) (decisions under informal dispute settlement procedures "shall not be legally binding on any person" under MMWA). If the FTC had good reason to subscribe to the view that binding arbitration is prohibited under the MMWA, then one could credibly argue that the FTC likewise had good reason to exclude arbitration agreements from the list of items that must be disclosed in a written warranty. If binding arbitration of written warranty claims is impermissible, then it would be a superfluous, empty gesture for the FTC to oblige warrantors to include the terms of those unenforceable arbitration agreements in warranty disclosures under the single document rule.

But the FTC no longer has good reason to believe that arbitration agreements are

---

legal remedies in the courts." 15 U.S.C. § 2302(8). Arbitration is a substitute for pursuing legal remedies in the courts. It is not a prelude to such judicial actions. Therefore, construing "informal dispute settlement procedures" to mean arbitration agreements would yield a result that was inconsistent with, and would render nugatory, other language utilized by Congress in the very same sentence of the MMWA. *See Walton*, 298 F.3d at 475 (declaring that "binding arbitration generally is understood to be a *substitute* for filing a lawsuit, not a prerequisite").

-13-

unenforceable in the MMWA setting.  Three years ago, the Eleventh and Fifth Circuits unambiguously held in rapid succession that "written warranty claims arising under the [MMWA] may be subject to valid binding arbitration agreements."  *Davis*, 305 F.3d at 1278; *see also Walton*, 298 F.3d at 479 ("We hold that the MMWA does not preclude binding arbitration of claims pursuant to a valid, binding arbitration agreement, which the courts must enforce pursuant to the FAA."); *Pack v. Damon Corp.*, 320 F. Supp.2d 545, 558 (E.D. Mich. 2004) (following *Davis* and *Walton*, and concluding that the MMWA does not preclude enforcement of arbitration agreements as to warranty claims).  In the intervening timespan, no published decision of any federal appeals court has criticized or broken ranks with the *Davis/Walton* approach.[17]  As a result, the FTC has been on notice since September 2002 that in at least two federal circuits, MMWA written warranty claims are arbitrable in the presence of a valid arbitration agreement.  Had the FTC wished to amend its regulations under the MMWA to account for these authorities and place arbitration agreements within the scope of required disclosures under the single document rule, it could have done so.  The agency's apparent inaction in the presence of substantial federal appellate authority that arbitration agreements are permissible under the MMWA cuts directly against the Dixons' hypotheses about how the FTC would have worded § 701.3 if it had known that arbitration agreements are enforceable in the MMWA context.[18]

　　　　More fundamentally, the Dixons are asking this Court to encroach on the statutory and regulatory framework by unilaterally constructing a judicial rule that neither Congress nor the FTC has seen fit to create.  Congress delegated the authority to the FTC, not to the federal judiciary, to

---

[17]　　　　*But see Rickard v. Teynor's Homes, Inc.*, 279 F. Supp.2d 910, 921 (N.D. Ohio 2003) (declining to follow *Davis* and *Walton*, and instead upholding FTC regulations that MMWA bars arbitration agreements for written warranty claims).

[18]　　　　The Dixons again point to a Delaware Chancery Court opinion in which the vice chancellor opined, "I have no doubt that when the FTC or Congress revisit the regulatory scheme in this area, they will adhere to *Cunningham* and decline to adopt the position advanced by DaimlerChrysler, which, in effect, is that while warrantors are required to include any nonbinding arbitration provisions in the warranty itself, they should be free to include binding arbitration provisions in a separate document." *DaimlerChrysler*, 848 A.2d at 588-89.  Given the FTC's inaction in the years following *Walton* and *Davis*, this Court does not share *DaimlerChrysler*'s sanguinity as to what modifications the FTC or Congress might wish to make to the single document rule.

enumerate the items that must be disclosed in a written warranty.  In so doing, Congress made clear that the MMWA disclosure requirement extends only "to the extent required by rules of the Commission."  15 U.S.C. § 2302(a).  The FTC responded to this delegation of authority with a rule delineating nine specific categories of information that must be disclosed.  *See* 16 C.F.R. § 701.3.  The FTC's rule omitted any reference to arbitration agreements.  Neither Congress nor the FTC requested the assistance of the judiciary to "fill in" additional disclosure requirements that the agency may have inadvertently overlooked or that the courts might think are prudent.  It is not the place of this Court to speculate as to what the FTC's intentions may have been in drafting § 701.3, much less to judicially supplement the regulation by engrafting onto it the Court's own views as to which categories of information should be disclosed in a written warranty under the MMWA.[19]

Simply put, the Court cannot assume that Congress and the FTC made a mistake in omitting arbitration agreements from the list of MMWA disclosures.  Even if it could, the Court will not step outside the judicial role to assume the distinctly legislative responsibility of welding its own normative values onto the comprehensive statutory and regulatory regime giving rise to the single document rule.[20]

---

[19]     In that regard, the Court cannot embrace the Dixons' equitable arguments that if Congress and the FTC had intended to include nonbinding alternative dispute mechanisms within the parameters of the single document rule, then they must have also intended to include arbitration agreements.  Surely, Congress and the FTC could have referenced arbitration agreements had they wished to do so, and could have modified the statute and/or the regulations in the wake of *Dixon* and *Walton* had they wished to clarify their intentions.  There are, or may be, valid policy reasons for treating arbitration agreements differently than other alternative dispute mechanisms.  *See generally Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (interpreting FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements").  The Court therefore declines the Dixons' invitation to hold that excluding arbitration agreements from the single document rule "makes no sense whatsoever" and to interpret the MMWA as including such agreements within the ambit of the rule.  (Defendants' Supplemental Brief, at 7.)

[20]     In so finding, the Court does not credit Patriot's argument that "courts are likely to strike down any rule that attempts to create special disclosure requirements for arbitration agreements subject to the FAA."  (Plaintiff's Supplemental Brief, at 20 n.2.)  The lone authority on which Patriot relies for this proposition is *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).  *Doctor's Associates* rested on the notion that "Congress precluded States

B.      *Whether Binding Arbitration Agreements are Viable under the MMWA.*

As an alternative argument, the Dixons offer a critique of the *Davis* decision.  In particular, they charge the *Davis* panel with unduly subordinating the MMWA to the FAA, misreading the legislative history of the MMWA, misunderstanding the meaning of the term "informal dispute settlement mechanism" as used by Congress, and ignoring fundamental rules of statutory construction.  At the conclusion of this litany of perceived errors, the Dixons exhort the Court to adopt a ruling "that binding arbitration is not permissible in the context of consumer product warranties."  (Defendants' Supplemental Brief, at 10.)  The Court appreciates the Dixons' belief that *Davis* "was incorrectly decided."  (*Id.* at 11.)  Be that as it may, *Davis* is the law of this circuit unless and until it is overruled by the Supreme Court or by an *en banc* decision of the Eleventh Circuit.  The undersigned is constrained to follow *Davis* and will not cast it aside, irrespective of the Dixons' criticisms.

C.      *Whether the Arbitration Agreement is Unconscionable.*

The Dixons' final objection to the Arbitration Agreement is that it is unconscionable, and therefore void.  As grounds for this argument, the Dixons maintain that the terms of that agreement "grossly favor Patriot at the expense of the Dixons" because they "are boilerplate in nature" and "purport to apply to all possible claims," effectively operating as "a waiver of the Dixons' constitutional right to a jury trial."  (Defendants' Memorandum (doc. 8), at 22.)  Alternatively, the Dixons maintain that the Arbitration Agreement is unconscionable because the Dixons "did not enter into [it] voluntarily and with a meaningful choice," but instead "were effectively forced to acquiesce" to it.

This ground has been ploughed on numerous occasions by Alabama courts.  Undoubtedly, "[a] court should refuse to enforce an arbitration agreement where the record supports a determination of unconscionability."  *Ex parte Napier*, 723 So.2d 49, 52 (Ala. 1998).  "[T]he party asserting the defense of unconscionability has the burden of proving unconscionability."  *Napier*, 723 So.2d at 52; *see also Fleetwood Enterprises, Inc. v. Bruno*, 784 So.2d 277, 281 (Ala. 2000) ("Unconscionability

---

from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts."  517 U.S. at 687.  That case in no way supports plaintiff's position, inasmuch as *Doctor's Associates* did not cabin Congress's authority to limit the enforcement of arbitration clauses in particular statutory contexts.

is an affirmative defense ... and the party asserting the defense bears the burden of proof."); *Harbor Village Home Center, Inc. v. Thomas*, 882 So.2d 811, 818 (Ala. 2003) (similar).  A bargain is unconscionable when it is one that "no man in his sense and not under delusion would make on the one hand, and [that] no honest and fair man would accept on the other."  *Leeman v. Cook's Pest Control, Inc.*, 902 So.2d 641, 645 (Ala. 2004) (citation omitted).

To assess the merits of an unconscionability defense, Alabama courts examine whether the arbitration agreement's terms are grossly favorable to one party, and whether the favored party has overwhelming bargaining power, such that the agreement as executed is "patently unfair."  *Leonard v. Terminix Intern. Co., L.P.*, 854 So.2d 529, 538 (Ala. 2002); *see also Stevens v. Phillips*, 852 So.2d 123, 134 (Ala. 2002) (unconscionability rests on "prevention of oppression and unfair surprise" and is not intended to disturb mere "allocation of risks because of superior bargaining power").

According to the Dixons, the provisions of the Arbitration Agreement are grossly favorable to Patriot because they would cover all possible claims relating to the manufacture and sale of the mobile home, they violate a simple consumer's reasonable expectations in an unspecified way, and they effectively waive the consumer's right to a jury trial.  (Defendants' Memorandum, at 22.)  These arguments sweep too broadly.  Under the Dixons' rationale, every binding, comprehensive arbitration agreement in a retail transaction would be "grossly favorable" to the seller, and therefore unenforceable.[21]  That is not the law.  *See Leeman*, 902 So.2d at 645 ("arbitration agreements are not in themselves unconscionable"); *Patrick Home Center, Inc. v. Karr*, 730 So.2d 1171, 1173 (Ala.1999) (under Alabama law, arbitration agreements are not inherently unfair or oppressive, nor is mere existence of an arbitration agreement, without more, sufficient to establish unconscionability).  Rather, to satisfy the "grossly favorable" standard, courts look to whether the agreement includes (a)

---

[21]     Rare, indeed, is the arbitration clause that does not embrace all possible causes of action related to the subject transaction and cut off the consumer's right to a jury trial on such claims. Thus, the Dixons' critique is not tailored to this Arbitration Agreement, *per se*, but rather reads like an indictment against arbitration clauses generally.  A formidable wall of binding precedent, not to mention the staunchly pro-arbitration policy expressed in the FAA, forbids this Court from crediting these contentions and invalidating arbitration agreements across the board.

terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy, (b) terms that would impermissibly alter fundamental legal duties, (c) terms that seek to negate the reasonable expectations of the nondrafting party, and (d) unreasonably and unexpectedly harsh terms having to do with central aspects of the transaction.  *See Leeman*, 902 So.2d at 645.[22] The Dixons have come forward with no evidence that this Arbitration Agreement is any more slanted or one-sided than the run-of-the-mine arbitration provision in any other consumer transaction.  Therefore, they have failed to satisfy the "grossly favorable" prong of the unconscionability test.

Even if the Arbitration Agreement were improperly tilted in Patriot's favor, the unconscionability defense would remain unavailable here because the Dixons have not shown that Patriot held "overwhelming bargaining power."  The Dixons state, in conclusory terms and with no supporting evidence, that they lacked "meaningful choice" and that they were "effectively forced to acquiesce to the arbitration requirement."  (Defendants' Memorandum, at 23.)[23]  In support of this argument, the Dixons state, again without support, that virtually all manufacturers of mobile homes in the Dixons' area require arbitration agreements as a condition of sale.  But Alabama law requires a much greater showing to establish unsconscionability on that basis.  In *Conseco Finance Corporation-Alabama v. Boone*, 838 So.2d 370 (Ala. 2002), the Alabama Supreme Court rejected an unconscionability argument where a buyer presented evidence that the lender controlled 38% of the market for financing mobile homes, but offered no evidence of the practices of other lenders, much less evidence that the purchaser attempted to "shop around" for a financing arrangement that would not

---

[22]    For example, an arbitration agreement has been found not to be grossly favorable to either party where the party seeking to avoid enforcement made no showing of biased decisionmakers in arbitral proceedings.  *See also Briarcliff Nursing Home, Inc. v. Turcotte*, 894 So.2d 661, 666 (Ala. 2004).

[23]    The statement that they "intend to produce evidence" to back up these allegations at some unspecified future date is unavailing, as a matter of law.  If the Dixons had evidence they wished to present in support of their unconscionability defense, it was incumbent on them to proffer such evidence now, rather than simply articulating a vague intent to present it in the future.  *See Leeman*, 902 So.2d at 644 (explaining that "a motion to compel arbitration is analogous to a motion for summary judgment").

require an arbitration clause.  *Id.* at 373; *see also Jim Walter Homes, Inc. v. Saxton*, 880 So.2d 428, 431 (Ala. 2003) ("a party claiming to have had no 'meaningful choice' must present evidence indicating that he or she could not have entered into a similar contract without an arbitration requirement either with the same party or with a competitor"); *Briarcliff Nursing Home, Inc. v. Turcotte*, 894 So.2d 661, 666 (Ala. 2004) (by not showing that the desired services were unavailable elsewhere without agreeing to arbitration, consumer failed to show overwhelming bargaining power prong of unconscionability test).  In the absence of evidence that the Dixons could not reasonably have procured a comparable mobile home from another vendor without signing an arbitration agreement, their "meaningful choice" ground for unconscionability rings hollow.[24]

In a final assault on the Arbitration Agreement, the Dixons complain that the requirement that arbitration proceed under the AAA's Commercial Rules of Arbitration ("Commercial Rules"), instead of the cheaper and simpler Rules for Consumer-Related Disputes ("Consumer Rules"), condemns them to paying thousands of dollars in arbitration fees that they cannot afford.  In particular, the Dixons argue that the Commercial Rules oblige them to pay a $750 filing fee, a deposit of $750 per day for a hearing, and half the arbitrator's fee.  (Defendants' Memorandum, at 24-25.)[25]  The Dixons offer no estimate or calculations of these costs, other than to say that they "may amount to thousands of dollars."  (*Id.* at 25.)  Because the Consumer Rules provide for a less expensive fee structure, the Dixons contend,

---

[24]     On a related note, the record includes no evidence that the Dixons questioned or challenged the Arbitration Agreement in any way when it was presented to them, or that they wavered at all before signing it.  Where a consumer signs without question a proffered form agreement containing an arbitration clause, "it is difficult to conclude that [he] lacked a meaningful choice--and that this lack of choice could render the arbitration provision unconscionable--when in fact [he] never undertook to actually make a choice."  *Leeman*, 902 So.2d at 647.  This principle also militates against a finding of unconscionability here.

[25]     The Dixons also assert that they would be responsible for their own attorney's fees, plus witness fees, expert fees, and the like.  (*Id.*)  These ordinary litigation expenses would appear to rest with the Dixons regardless of whether they proceed under the Commercial Rules, the Consumer Rules, or in state court.  It is unclear how the pragmatic default rule of the "American Rule," requiring litigants to pay their own litigation expenses, in any way promotes the Dixons' unconscionability defense.

Patriot's invocation of the Commercial Rules is symptomatic of a bad-faith effort to squeeze "simple consumers" like them out of any remedy. The Court disagrees.[26]

"[W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *BankAmerica Housing Services, Div. of Bank of America, FSB v. Lee*, 833 So.2d 609, 620 (Ala. 2002). The Alabama Supreme Court has recently had occasion to consider whether the expenses associated with the Commercial Rules are so exorbitant as to render an arbitration agreement unconscionable. In *Leeman*, the consumers contended that a provision in a termite agreement requiring arbitration in accordance with the Commercial Rules was unconscionable, based on evidence in the record that those rules require an initial filing fee of $3,250, a case service fee of $1,250, and a potential for arbitrator fees as high as $8,000. 902 So.2d at 649-50. The *Leeman* court held that the consumers had not made a sufficient showing of excessive arbitral costs, reasoning that: (i) evidence of costs in other cases is not probative of the costs of arbitration in this case; (ii) the Commercial Rules allow for reduction or deferral of expenses in cases of extreme hardship; (iii) the Commercial Rules also allow the arbitrator to assess and apportion arbitral fees and expenses between the parties, such that the consumer might have to pay nothing in the ensuing arbitration; and (iv) the consumers had failed to demonstrate their inability to afford the initial costs of filing an arbitration claim. *Id.* at 650-52.

More generally, Alabama courts have rejected unconscionability arguments predicated on the cost of arbitration where the party seeking to avoid arbitration "does not provide any evidence, such as her income, her family's expenses, or the estimated costs of the arbitration procedure, that would

---

[26]   To the extent that the Dixons' unconscionability argument is predicated on their self-depiction as unsophisticated "simple consumers" (Defendants' Memorandum, at 22-23, 26), applicable precedent squarely refutes their suggestion that a lack of sophistication equates to unconscionability. *See Ex parte Parker*, 730 So.2d 168, 171 (Ala. 1999) (rejecting mobile home buyer's unconscionability argument where buyer had a 10th grade education, had extreme difficulty reading and was being tutored in reading); *Napier*, 723 So.2d at 52 (arbitration agreement not unconscionable where mobile home buyer was 77 years old, had poor eyesight, never finished high school and could not read small print).

support an argument that the use of the Commercial Rules renders the arbitration clause unconscionable from a financial standpoint." *Stevens*, 852 So.2d at 133-34 (purchaser claimed that arbitration fees would be $2,000, as compared to court filing fee of $200).  In that regard, an unquantified risk that a plaintiff "will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 134 (citation omitted); *see also Fleetwood Enterprises*, 784 So.2d at 281 (bare allegation by mobile home purchaser, unsupported by substantial evidence, that arbitration agreement is unconscionable because she cannot afford to pay arbitration fees cannot defeat motion to compel arbitration); *Johnnie's Homes, Inc. v. Holt*, 790 So.2d 956, 965 (Ala. 2001) (declining to find arbitration provision unconscionable despite evidence that purchaser would have to pay $2,000 arbitration fee and that he has limited financial capacity).

In this case, the Dixons have failed to show that the arbitral costs to which they would be exposed under the Commercial Rules would be excessive.  Even if they had done so, their unconscionability argument would fail because the record contains no evidence that the Dixons are unable to pay the costs of arbitration under the Commercial Rules.  There is thus no record basis for finding that the designation of the Commercial Rules in the Arbitration Agreement will have any meaningful impact on the Dixons' ability to prosecute their claims against Patriot.  The Dixons have failed to establish their unconscionability defense on the basis of exorbitant fees.[27]

In light of this analysis, the undersigned is of the opinion that the Dixons have failed to meet their burden of establishing that the Arbitration Agreement is unconscionable.

---

[27]    Indeed, the Dixons' fears of being encumbered with excessive fees under the Commercial Rules may be a mirage.  Patriot has presented uncontradicted authority and argument that, notwithstanding the language of the Arbitration Agreement, the Dixons may be entitled to the benefit of the Consumer Rules pursuant to Rule C-1 of the AAA's Supplementary Procedures for Consumer Related Disputes, effective July 1, 2003.  (Plaintiff's Brief (doc. 13), at 6.)  Under those Supplementary Procedures, the Consumer Rules may apply in any arbitration agreement between a consumer and a business providing for use of AAA rules, where the business has a standardized, systematic application of arbitration clauses and where the terms of purchase of products for personal or household use are primarily non-negotiable.  The Supplementary Procedures further expose the Dixons' financial unfairness argument as a red herring.

**IV.      Conclusion.**

For all of the foregoing reasons, the Court finds that the Arbitration Agreement signed by the Dixons and Patriot is valid, enforceable and binding on the parties.  Accordingly, plaintiff's Petition to Compel Arbitration is **granted**.  The Dixons and Patriot are hereby **ordered** to proceed to arbitration in accordance with the terms of the Arbitration Agreement.  Such arbitration proceedings shall encompass all of the Dixons' claims asserted against Patriot in the underlying state court action.  Given that the compulsion of arbitration was the sole *raison d'etre* of this lawsuit, the Clerk's Office is directed to close this file.

DONE and ORDERED this 7th day of November, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE